Good morning, Your Honors. May it please the Court, I'm Julia Follansbee, representing the appellant William Plise, and I'd like to reserve two minutes for rebuttal. Needless to say, this is a very disturbing case, and when I first took it on, I had no idea that I would have the role of Sherlock Holmes, and it's completely fortuitous that I managed to discover all these things that the trustee knew all along about this case, but conceal them from the Court. Obviously, the issue here is whether the LLC or the bank account had to be listed on Schedule B as personal property, and I believe that this case can be resolved as a matter of law, and I'm gonna walk you through that based on one sentence in the bankruptcy code and the documents that were never presented to the courts below. The sentence in the bankruptcy code is 11 U.S.C. 541 A. 1, which states that the bankruptcy estate consists of the debtor's legal and equitable interest in property at the commencement of the bankruptcy, and in Plise's case, this is April 23rd, 2012. This is the only property that must be Now, we can eliminate right away the LLC as being Plise's personal property on that day. Isn't that the property he had all of his money, the money all went to him? Pardon? Didn't all the money in that account go to him? Well, there's a line of credit loan agreement that I'll get into. Isn't he the only one that took the money out? Yes. Wasn't he the only one that could get the money out? No, I think that the owner could also take the money out, and the owner was Halverson. Wasn't he the Plise's only signatory on the account? He was the only signatory on the account, that's right. And in any event, because she settled with Halverson to get this LLC, that's pretty good evidence that Plise did not own the LLC. She also had the amended and restated operating agreement, which in its 35 pages makes abundantly clear that Halverson had complete ownership and control of the LLC. So if you look at it that way and see that Halverson is the true owner and has complete control in the 35 pages, that is not a basis to deny any discharge as a matter of law because it's not a failure to list that LLC on Schedule B. Now, how does the trustee get around this problem in this court? She says, well, I'm going to refine my argument to the legal issue on appeal is whether Plise intended to defraud his creditors by omitting his exclusive use of a bank account in the name of the LLC on Schedule B. Now, if you look at the ownership documents that the trustee had, they're pretty clear on what happened here. They make very clear what Plise's real relationship to the LLC's bank account is. And the first is the line of credit loan agreement, which the trustee had on November 7th. It was hand-delivered to her, and it's dated July 12th. Now, that document wasn't before the district court or the bankruptcy court. No, it wasn't before either court. You can't really consider that document on appeal for the first time. That's not a properly judicially noticeable document. Well, I think that if you, you know, unfortunately here we've got a situation where Plise's attorney had a conflict of interest and really didn't bring any of this to the attention of either the bankruptcy court or the district court. And I think that you can take judicial notice because all of these things are a matter of public record. And if you don't, there's really an inherent injustice here that I think when you look at what these documents are and what they say, they fully resolve this case. Weren't they available to the appellant at the time of the bankruptcy and district court proceedings? Absolutely. And that was one of my problems when I took on this case. I couldn't figure out why didn't he bring these documents forward because he's the one that had them and gave them to the trustee. And so he knew what was in them just as well as the trustee did. And that was my problem in the early stages of this case. I couldn't figure out how to explain that until we discovered all the evidence that at the same time, Schwarzer was representing Plise, he was also representing the trustee, and he did so in 11 different bankruptcies. So that's a little twist in this case, and that's why we filed our motion for a conflict of interest so that you could see our documentation that that's what happened. Wait a second. This brief, your appellant's opening brief, lists both you and Schwarzer as representing the appellant. That's interesting, isn't it? Yes. In fact, he was my co-counsel, and I had no idea at the time that he had a conflict of interest, but it was interesting to me when I found these documents. I said, you know, why aren't these in the... You were co-counsel during these proceedings. Why didn't you have access to those documents? Well, I did, but I wasn't the co-counsel in either the district court and I wasn't co-counsel in bankruptcy court. I came on solely as appellant counsel and only after the two courts had ruled against Plise. So I had nothing to do with that whatsoever, and that's why this became so interesting because I could not figure out why my co-counsel at the time had not presented these documents. And so, you know, he signed on, which in my view is kind of an admission on his part that he failed to make this really clear with the documents that he always had, and so he signed on the briefs, and that's really quite ironic. And at the time he did so, I had no idea that he had a conflict with the trustee. By representing her at the same time he was representing Plise. And so in any event, if we look at the line of credit loan agreement, because that explains the relationship here with Plise to the bank account, it tells us. And that line of credit loan agreement is at 3ER467-74, and here are its terms. It says very clearly the lender is the LLC and the borrower is William Plise. The line of credit amount is $500,000, and Halverson requires Plise to execute a second document, a promissory note, commemorating his debt and other obligations under the line of credit. And the promissory note is made and delivered by Plise in favor of the LLC as the lender. And I will also tell you that in that promissory note it says flat out that Plise is paying an interest rate of 20% per annum. So it's obviously a very serious agreement. Now the other thing I want to tell you about the sole signatory stuff, back in the credit agreement on page 468, paragraph 3.1, it says each draw by Plise is to be made by check drawn on an account in the name of or designated by the lender over which the borrower, Plise, has signatory authority. So this is absolutely provided for in this missing document that these attorneys had. Question. Assuming we can't look at documents that were not in the record before the court below, what error did the court below make that you hang your hat on? Well, what I hang my hat on mostly is the STIP email, because there the court was assuming that there was an attorney-client privilege, and there was absolutely no evidence whatsoever of a relationship there. They just took the trustee's word for it that there was an attorney-client relationship, but there is absolutely no evidence in this record, other than the innuendo brought in by the trustee, that STIP is in fact representing Plise and made these things. Now we know also, if you look at the credit agreement, that Plise is allowed to use the loan for any purposes, personal purposes, without limitation. Now you may have a question as to why is Halverson doing this. Well, it's because Plise has always been a rainmaker, and these people have had a long business association, and he is just hoping that Plise will, you know, find something that will make him some money. So if Plise has the permission to use the bank account for personal purposes, and he can draw on it under his signatory authority, it does not follow that he owns the account. So it does not belong on Schedule B. Now I do want to explain the STIP email in the light of these documents that were never brought before a court, and that it says, no other persons in the line of credit loan agreement shall have any right to the loan funds, records, documents, and statements pertaining to the loan or any funds in the account. And then if you look at the operating agreement that Halverson had at paragraph 6.8.1, it specifically states, the nonmember and Plise hereby covenants and agrees that he shall keep secret and retain in strictest confidence and not in any manner divulge it to anyone else confidential information. And the confidential information is carefully defined as information relating to financial statements. And, of course, this would include the bank account. So that explains the STIP email when Plise is just truthfully saying, hey, I have to get the permission of the owner of the LLC and the bank account before I reveal these things. So seen in the proper context of these documents, which weren't brought before the courts until now, sadly to say, the STIP email really demonstrates that Plise had a lack of ownership and control of the bank account. If he had had ownership and control of the bank account, he could have released them immediately. But he was bound by these confidentiality agreements. So what is so terribly wrong here is that the trustee had all of these omitted documents by the end of November 2012, yet she still proceeded to file her ninth claim for a false oath. And what's really interesting, in the December 20th credit meeting, precisely at the second ER, page 221, the trustee specifically asked Plise if he has a credit instrument and a promissory note. And Plise reminds her that he had already given her those very documents. Then, when the motion for summary judgment is filed, here's what the trustee says. She says, and it's a lie, she says the debtor has failed to provide supporting documents for the loan. Nonsense. She had them the whole time. And she had the supporting documents since November 7th, and yet she filed this on December 27th. Now, what happened here is because these documents were left out and because Mr. Schwartzer was rather compromised by also having the trustee as his client on 11 different matters, the impression was left that Plise owned the LLC on the petition date when the trustee knew he did not. She knew he did not because she went after Halverson to settle for the LLC. And she created the impression that Plise was hiding his credit relationship when she knew it was fully disclosed in the schedules, I, J, and F, that the trustee even refers to in the 341 meetings. Well, this is like a snapshot photo, you know, you had this credit facility and it's your only source of income. Now, that's how I started looking at this record because I got the 341s that were missing and started to read them and saw that everything in here was discussed in the missing 341s, but the attorney for Mr. Plise didn't have any of this forward. So everybody is kept in the dark. You said you wanted to reserve two minutes. Oh, all right. Thank you, Your Honor. Thank you, Your Honor. May it please the Court. My name is Jacob Homann, and I am counsel for the appellee, Trustee Shelley Crone. To say that this case has been contested would be an understatement. The appeal before this court concerns an order that was entered by the bankruptcy court granting the trustee's partial motion for summary judgment concerning the ninth claim in her complaint against Mr. Plise, seeking a denial of his discharge under 11 U.S.C. 727A-4. The crux of the debtor's argument on appeal is to be that the bankruptcy court erred in finding that he had the requisite intent in the context of a motion for summary judgment to allow this order to be entered, namely that he made this false oath that was material with fraudulent intent. And to support this argument, the debtor is largely relying on documentation that was not part of the 5550 Las Vegas in testimony concerning his 341A meeting of creditors, as well as whether or not the court properly considered what has been defined in the briefs as a stiff email. Now, turning to the first point concerning the disclosure of 5550 Las Vegas in the debtor's bankruptcy schedule, the trustee's contention all along that this bank account that was referenced by opposing counsel needed to be identified in Schedule B as Mr. Plise was the sole signatory on this account and was the only person that had access to it, and used this account to pay all of his personal expenses in the years preceding his bankruptcy case. The source of this account was also the source of many fraudulent transfers that were commenced by the trustee. And in addition, Your Honors, the debtor was required to schedule his argument that he transferred this ownership interest prior to his petition date. He was required clearly to disclose this interest in paragraph 18 of his statement of financial affairs, which requires him to list all previous businesses in which he had been an owner, director, officer, or executive in the six years preceding his bankruptcy case. Now, in evaluating all of this information, I think it's very important to look at the timeline of this case, which is the bankruptcy case was filed on April 23, 2012. May 7, 2012, the debtor filed his initial bankruptcy schedules as well as a declaration stating that the information contained therein was truthful and accurate. Importantly, the 5550 Las Vegas bank account was not disclosed in Schedule B, and the prior ownership interest in 5550 Las Vegas was not identified in paragraph 18 of his statement of financial affairs. On May 9, the debtor amended his statement of financial affairs but still failed to list his prior ownership of 5550 Las Vegas. On September 9, 2012, the trustee commenced the underlying adversary proceeding seeking to deny the debtor a discharge for, among other things, failure to file accurate schedules. The claim that is before this Court was not initially part of that claim, which is the reason why on November 13, 2012, the trustee filed a motion for leave to file an amended complaint that included the claim for relief for denial of discharge under Section 727A4. The trustee, as part, after filing the initial complaint on September 9, requested and obtained ex parte relief from the Court to conduct certain discovery of third-party financial institutions and subpoenaed the bank account for 5550 Las Vegas. On November 21, 2012, the debtor again amended his statement of financial affairs but still did not disclose his interest in this entity. In fact, it wasn't until December 20, 2012, that the debtor amended his statement of financial affairs to disclose this entity. Now, the crux of the appellant's brief seems to be focused on testimony as well as documents that were provided to the trustee that were not part of the record below. It's the trustee's position that it's improper for this Court to consider that because these arguments were waived and should have been presented to the bankruptcy court for it to consider this. However, even if this Court was to consider these documents, the trustee has laid out a voluminous amount of case law in her briefs that essentially testimony at a 341 or an informal provision of documents to the trustee does not satisfy the debtor's obligation to maintain accurate schedules. Here's my question to you. In the motion of summary judgment on this issue, did the bankruptcy court make a credibility judgment? I don't think they did, Your Honor. I think the issue before Didn't they say something like I can't believe what you said, something like that? I think the bankruptcy court analyzed the issue concerning when it is appropriate to allow a motion for summary judgment on something such as intent, which is namely that there can be no reasonable inference taken in favor of the debtor. And that was the case in this case. And I think the key factor in that is what has been defined as a stiff email. Now, just to provide the Court with some context to that email that was sent two weeks approximately after the debtor filed his initial bankruptcy schedules on May 7th and states as follows. I, meaning Mr. Stipp, have discussed the matter with the debtor and he does not want you to provide any information to the bankruptcy trustee regarding the account in the name of 5550 Las Vegas. At this point, you should not be providing any information or answering any questions other than what I authorize you to provide slash answer about this account. This account does not belong to the debtor personally, although he is the only signatory on the account and he is still working with Mr. Halverson on obtaining his consent to disclose his statement to the bankruptcy trustee. As I understand it, there are transactions involving Mr. Halverson that Mr. Halverson personally may not want disclosed. Attached are the bank statements for 5550 Las Vegas LLCs. These statements are for the 12 months prior to the debtor's bankruptcy petition. And then in all caps, you do not have authority to release these to the bankruptcy trustee. I am providing them to you for your review only and subject to the debtor's consent, which he may not provide, to release them to the trustee. This account was opened on approximately February 27th, 2009. The debtor has been the only signatory on the account since its opening. Kagan. Okay. I'm going to sneeze, I think. Fires. But why was that e-mail admissible? Well, it was admissible, Your Honor. There was contention by opposing counsel that there was not the ability, there was not an established attorney-client relationship, and there was no evidence of that in the record. However, if this Court turns to ER 190, this document was provided to the trustee from Mr. Schwartz, a former counsel for Mr. Police, where he states in a letter, and I quote, With respect to the documents that you provided to my office, Mr. Police is elected to waive his attorney-client privilege. So in that instance, he's affirmatively But that's a letter from somebody else. That's not a letter signed by police, is it? It's not, Your Honor, but it's a letter signed by his counsel. And the only party that has the ability to waive the attorney-client privilege is the individual. And with that, he's mentioned that Mr. Police has elected to make this decision. Mr. Schwartz is his agent. And in terms of party admissions, Federal Rule of Evidence 802d2d allows statements made by the party's agent or employee on a matter that is within the scope of that relationship. And that was the reason why the Court properly admitted this in the evidence and did not abuse its discretion in doing so. Now, turning once again to the significance of this Stipp email, it clearly shows that as of a matter of weeks after filing the bankruptcy petition, Mr. Stipp, who was counsel for Mr. Police, had discussed the existence of the 5550 Las Vegas bank account with him. They knew of its existence, yet they made the conscious decision to withhold it from the trustee. And did not disclose at least documentation to the trustee until November, as mentioned by opposing counsel. However, this was almost seven months after the case had initially been filed. So who is Diaz? Damon Diaz? Your Honor, that was proposed. They were discussing Mr. Diaz initially representing Mr. Police in his bankruptcy case. Okay. So and Bichwarzer was his counsel? Bichwarzer, I don't have the precise date, Your Honor. But Mr. Bichwarzer became counsel much later in the case. It was around the time of the trustee's filing of her complaint. And Bowler? Who's Bowler? He was counsel for a creditor that had sent some documents. There was a document request there. And some of the documents wanted Mr. Police and Mr. Bichwarzer wanted to review them before turning them over to the trustee to see if they wanted to exert an attorney-client relationship. And they elected eventually to waive that attorney-client privilege. Now, in the brief, Your Honors, the trustee has cited a number of cases that essentially stand for the proposition that the debtor is required to maintain accurate schedules and correcting any omissions in a bankruptcy schedule after the trustee has already discovered it. It does not remedy that issue. So the importance of this timeline is that by the time the debtor is now contending through documents that the trustee believes are not proper to consider on appeal, but that said, even if the Court considers these documents, he wasn't testifying as to the existence of this account or providing the trustee documentation until after she had already commenced the complaint against him, seeking to deny him a discharge. How much money was in that account? There was several million dollars that had flown, that had flowed through that account within the years preceding his bankruptcy case. At the end, at the bankruptcy, it was just a couple hundred bucks, right? That's correct, Your Honor. By the time the bankruptcy case had been filed, the count was significantly less. But the importance of the requirement to disclose this in paragraph 18 of the Statement of Financial Affairs is to identify all previous business relationships the debtor may have. This case says when the debtor filed for bankruptcy, it was a no-asset estate. The only recoveries in this case have been through third-party avoidance actions. And so the identification of this entity in his Statement of Financial Affairs would be very useful in the trustee in investigating transfers that she believes could be avoidable for creditors. And, Your Honors, as mentioned earlier, although this is somewhat of a new rule case in the sense that summary judgment was granted when there is an intent element, given the unique aspects of it and the fact that both courts, both the bankruptcy court and the district court, concluded that no reasonable trier of fact could believe the statements that Mr. Police was making, we believe that summary judgment is appropriate in this case and that the court should affirm. Unless the court has any other questions. Does anybody have any other questions? None here. All right. Thank you, Counsel. Thank you, Your Honor. Thank you. Well, Your Honors, I wanted to address the credibility determinations that were made certainly by the bankruptcy court. She is finding facts and she is saying that she's not going to believe these lies that he's telling on the stand and that his explanations of things are cute. And so when you look at that from the standpoint of they're looking for genuine issues of material fact, those kind of comments are completely out of line because the bankruptcy court was being the judge, the jury, and the executioner. Now, let's talk about the issue of intent here. Rarely do you decide intent on a summary judgment because you have to get into the subjective state of the person's mind. And the bankruptcy court has recently recognized that it simply would not do that in a case we gave to you called Enri Murtaza, and that was in our 28J letter. The conditions of this case I think are such that you simply cannot infer what his intent was, even aside from the fact that documents were not given to the court that helped dispute what his intent was. When we talk about the statement of financial affairs, because a lack of a discharge is such a serious deprivation to a debtor, you have to be really careful not to just assume that you know what's in someone's mind. And that almost never happens, and that, of course, is the thing that his attorney did stress below, although there was plenty of other evidence he could have brought forward. This case isn't just about a formalistic signing of little check marks where you fill out what you did. I've heard it said that in the bankruptcy setting it's a pipe dream to think that any of these debtors are going to absolutely accurately fill out these forms in such a way that it will satisfy every requirement. Would you like to sum up, because you're over your time? Yes, I would, Your Honors. And I think what's critical for this Court is that the honest but unfortunate debtor is the one who is aimed at in the congressional policy, and only this court can further that policy by really looking at what happened here and what a terrible place my client was in because he didn't know that his attorney was compromised by also taking on the trustee as a client at the same time. Such a thing that I think that everybody lost track of what was going on here. He just wanted to continue to have both of them as clients, so he was eating on both sides of the cake, so to speak. So, also, there's such an injustice here that I think this Court should really take another look at what happened in this case. And remember that this trustee is not impartial. Why would she hide the records? The very thing she accuses my client of doing. Thank you. Thank you very much.
judges: Wardlaw, Gould, Collins